### INDEPENDENT DIE CO. v. SAVELS et al.

(District Court, D. Massachusetts. July 7, 1914.)

No. 375.

PATENTS (§ 328*)—INVENTION—DIE FOR CUTTING LEATHER.
    The Gimson patent, No. 709,008, for a die for cutting out leather, *held* void for lack of patentable invention, in view of the prior art.

In Equity. Suit by the Independent Die Company against Orvis M. Savels and others. On final hearing. Decree for defendants.

Nathan Heard and Frederick A. Tennant, both of Boston, Mass., for complainant.

Albert E. Fay and Southgate & Southgate, all of Worcester, Mass., for defendants.

MORTON, District Judge. This is a suit for infringement of letters patent to Gimson, No. 709,008, on knife, cutter, or dieing-out instruments, dated September 16, 1902. It was heard in open court under the new equity rules.

The patent in question relates to dies which are used in cutting leather and other materials into various shapes. They are, in prin-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

ciple, much like the old fashioned cookie cutter. The cutting edge is on the bottom of the die; the leather is laid on the table of the machine; the die is placed on the leather, and is pressed through it by a descending beam which strikes the die on the top. Both the beam and the table are of considerable width; and the die is placed here and there on the leather, wherever the cut can be made to the best advantage. The operations are carried on with considerable rapidity, from 3,000 to 4,000 pieces being died out by one workman in a day. It is desirable that the die shall be light so that it may be shifted from one place to another quickly and easily by the workmen's hands, that it shall be stiff so as to retain its shape under the pressure of the press, and that it shall safeguard the workmen's fingers as much as possible against the danger of being caught between the top of the die and the descending beam of the press.

At the time of the patentees' invention, the die in common use was the Walker die, which consisted of a smooth strip of steel and iron, about one-quarter of an inch thick, formed into the desired shape, sharpened around the bottom, and having parallel top and cutting edge. One of the objections to the Walker die was the danger of injury to which it exposed the operative. Its smooth sides became more or less slippery with use, and they furnished no indication to the operative when his fingers were dangerously near the upper edge of it and likely to be crushed by the descending beam. When Walker dies became chipped on the cutting edge, it was customary to send them back to the die makers to be repaired. The first step in repairing was to grind out the defect in the cutting edge. This left the die of less than the proper height, which is determined by the distance between the table and the beam of the press and has to be substantially the same for all dies used in the same press. In order to restore the proper height to the die after grinding off, two methods were customarily used. The first consisted of welding a piece around the top of it; the second, of drawing the die out, by heating it about an inch below the upper edge and pounding a groove around it—an adaptation of the familiar method of lengthening an iron bar by heating and pounding. The height of the die having been thus restored, the repairs were completed by paralleling the top and the bottom, and resharpening the edge. The result was that the repaired die had a shallow groove around it at an uncertain distance from the top, made by the round point of the hammer or tool used, and was in other respects substantially the same as when new. If a die which had been so repaired was again injured, it could be again repaired in the same way, in which event it would have two hammered grooves around it, one below the other. This method of repairing Walker dies had been in constant and general use by die makers in this country for many years before the plaintiff's invention, and has continued to the present time.

The grooves in the repaired die did in fact make the die less likely to slip in the operative's hand and, by one who noticed their distance from the top of the die, might have been used as safety guides or devices to prevent his fingers from straying over the top and being

crushed by the beam.    But comparatively few of the dies in each set were likely to have been so repaired, and on these the groove or grooves were not at any regular and uniform distance from the top edge.   And it never seems to have occurred, either to the makers of the dies or to the users of them, to put grooves in old dies or in new ones for the purpose of giving a better holding surface on the die, or of indicating to the workman where his fingers were with reference to the top edge of the die; nor does it seem ever to have occurred to anybody before the patentees to take advantage of the truss principle, by constructing a die with grooves and projecting ridges or ribs extending around it.   By such a construction a die can be made of less weight than the ordinary Walker die, and equally stiff.

In this state of the art the Gimson improvement was made, which consisted essentially of manufacturing dies from strips having ridges and grooves on their outer surfaces.   The corrugations were regularly placed and were alike on all dies in a set.   By this method a die could be constructed which was as stiff as the Walker die and of less weight, and was safer to use, because the corrugations on the outside of it gave a better hold, and, being uniform on all dies in a set, came to indicate to the operative where his fingers were with reference to the top of the die, and thereby diminished the danger of the fingers or hand being allowed to stray over the upper edge of the die and be caught by the descending beam.   In each of the plaintiff's dies, which were put in as exhibits, there are three grooves.   The ridges or ribs on the repaired dies do not seem to be so sharply worked out as those on the new dies, and the grooves are shallower; but there is no testimony that these differences are significant.

The plaintiff's patent says:

"Our invention refers to improvements in or relating to knives, cutters, or dieing-out instruments or tools."   Line 14.

＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊

"The objects of our improvements are to reduce the weight ＊ ＊ ＊ of material, and increase the strength of such instruments or tools ＊ ＊ ＊ and to greatly facilitate the holding or gripping of such ＊ ＊ ＊ dies." Line 22.

＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊  ＊

"In carrying out this invention the steel for forming such knives, cutters, or dies A is prepared by such means as rolling or pressing the corrugations or indentations D either in the direction of its length, as shown, or otherwise, or any combination of bars and ribs as may be best suited to the material.   Said ribs may be on the outer or both walls of the material, if desired.   It is well known that a die or cutting instrument in the form of a sole, with a beveled cutting edge, has been long employed, but in such knives as now made from wide strips of steel and known in the trade as 'deep knives' when placed under the press cannot be manipulated by the operator. So by making one or more ribs or corrugations in the material this end is attained."   Line 43.

The single claim of the patent is:

"A die, cutter, or dieing or cutting out instrument A having ribs, corrugations or indentations B on its outer walls, and its cutting edge in line with the interior walls thereof, substantially as described."

As the cutting edge of the Walker die was "in line with the interior wall thereof," it is apparent that this single claim of the patent in suit can be exactly and precisely read upon a Walker die which had been repaired by being drawn out and grooved in the way described. "Corrugations or indentations" (line 64) on the outer walls of a die were old in repaired dies and were capable of being used in such dies for the same purpose as the corrugations or grooves in new dies. The patentees were not the first to construct the die described in the claim.

The defendants are repairing dies in the manner above described, and are also manufacturing and intend to continue to manufacture new dies which have three grooves substantially similar in position and in character to those on the plaintiff's die. Infringement is conceded. The defense is that the patent is invalid for lack of novelty.

It is not contended for the plaintiff that the patent is entitled to a construction which includes repaired Walker dies (which are admittedly old), whether the corrugations are made by hammering around the die, or are rolled into the heated die by a rounded roll. The plaintiff has not pointed out wherein such repaired dies differ essentially from the plaintiff's new ones, nor how the claim can be construed so as to cover new dies made by the defendants and not to cover the repaired ones, unless perhaps by limiting it to dies made from corrugated stock and having a plurality of grooves or ridges. I doubt the soundness of such limitations. As to the plurality of grooves or ridges, the specifications of the patent plainly state that the object of the invention may be attained "by making one or more ribs or corrugations" (line 43); moreover, when occasion required, Walker dies were customarily repaired by inserting a second groove. As to the other saving limitation suggested: The patent is plainly not for a process or method of constructing corrugated dies, but for the corrugated die itself; to adopt this limitation is not to construe this patent, but to issue a new one.

What the patentees really did was to point out that grooves and ridges on the outer surfaces of dies might, if similarly placed on all dies in a set, so that the workmen's fingers became accustomed to them, be used as a safety device, and might also be used for lightening the weight of the die without impairing its stiffness. This was pointing out a use or function of such grooves and ridges which had theretofore escaped notice. In carrying out this idea, they naturally made their dies of corrugated instead of plain stock. It was a valuable suggestion, but I do not think it constituted a patentable invention as claimed in this patent. Marshall v. Packard (C. C.) 51 Fed. 755; National F. B. & P. Co. v. Stecher Lith. Co. (C. C.) 77 Fed. 828.

These considerations are sufficient to dispose of the case, without going into the prior art as to new dies as disclosed in the prior patents which were put in evidence.

Decree for defendants.